**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**MCALLEN DIVISION**

| | | |
|---|---|---|
| **JOSE CRISTIAN REYES LOPEZ,** | § | |
| **ANGEL ENRIQUE VAZQUEZ** | § | |
| **DAVALOS, and SANDRA ABIGAIL** | § | |
| **VILLANUEVA LOPEZ,** | § | |
| | § | |
| **Plaintiffs,** | § | Civ. No. _____ |
| | § | |
| **v.** | § | |
| | § | |
| **FLORIDA AG, LLC, J&D PRODUCE,** | § | **JURY TRIAL DEMANDED** |
| **INC. d/b/a LITTLE BEAR** | § | |
| **PARTNERS, INC. d/b/a LITTLE** | § | |
| **BEAR PRODUCE, and MARTIN** | § | |
| **VAZQUEZ,** | § | |
| | § | |
| **Defendants.** | | |

## PLAINTIFFS' COMPLAINT

1.      This is an action to recover damages for, among other things, unpaid

wages, breach of contract, and forced labor brought by Plaintiffs who were employed to

plant, harvest, or package produce for Defendants from December 2023 into May 2024.

2.      Plaintiffs bring this action to secure and vindicate rights afforded them by,

among other things, the Trafficking Victims Protection Reauthorization Act ("TVPRA"),

18 U.S.C. §§ 1589 and 1590, the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201

*et seq.*, and their employment contracts.

3.      Defendants employed Plaintiffs to perform temporary agricultural work

pursuant to the federal H-2A visa program. Throughout the course of Plaintiffs'

employment, Florida Ag disregarded the promises it had made to Plaintiffs and the

federal government, and instead Defendants violated Plaintiffs' rights under both federal

law and the terms of their work contracts. Defendants paid Plaintiffs a wage rate below

what was legally required, charged them illegal recruitment fees, made illegal deductions from their pay, failed to maintain accurate records of their hours and pay, and failed to provide them with adequate transportation, housing, and water as required by law. Florida Ag and Defendant Vazquez used physical aggression, intimidation, and threats of harm to coerce Plaintiffs to continue laboring for Defendants. Florida Ag and Defendant Vazquez retaliated against and threatened the physical safety of Plaintiffs who raised complaints about their wages and working conditions or participated in a federal investigation into Florida Ag's employment practices. Defendants' actions not only violated U.S. law and Plaintiffs' rights but also gave Defendants an unfair advantage over their U.S. business competitors who obeyed the law.

4.      As a result of Defendants' egregious misconduct, Plaintiffs seek declaratory relief, unpaid wages, compensatory and punitive damages, and attorney's fees to redress these violations of law.

## JURISDICTION AND VENUE

5.      This Court has jurisdiction over all federal claims pursuant to 28 U.S.C. § 1331 (federal question jurisdiction) and 28 U.S.C. § 1337 (actions arising under Acts of Congress regulating commerce).

6.      The federal claims in this action are authorized and instituted pursuant to 18 U.S.C. § 1595(a) (TVPRA) and 29 U.S.C. § 216(b) (FLSA).

7.      This Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367 because they are so related to the federal claims that they form part of the same case or controversy.

8.  Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in the McAllen Division of the U.S. District Court for the Southern District of Texas.

9.  This Court has the power to grant declaratory relief pursuant to 28 U.S.C. §§ 2201 and 2202.

## PARTIES

10.  Each Plaintiff is a citizen of Mexico who was lawfully admitted to the United States pursuant to 8 U.S.C. § 1101(a)(15)(H)(ii)(a), commonly referred to as the "H-2A program." Each Plaintiff resided in Hidalgo County, Texas while working for Defendants.

11.  Defendant Florida Ag, LLC ("Florida Ag") is a duly registered limited liability company based in Edinburg, Texas. Florida Ag's registered agent is Martin Vazquez with a registered address in Edinburg, Texas.

12.  Little Bear Partners, Inc., d/b/a Little Bear Produce and formerly J&D Produce, Inc. ("Little Bear") is a duly registered for-profit corporation based in Edinburg, Texas. Little Bear's registered agent is James V. Bassetti with a registered address in McAllen, Texas.

13.  Defendant Martin Vazquez ("Defendant Vazquez") is a natural person. In 2023 and 2024 Defendant Vazquez resided in Hidalgo County, Texas and served as the foreman and agent of Florida Ag.

**STATEMENT OF FACTS**

**I.      The Federal H-2A Visa Program**

14.     The federal H-2A program was created by the Immigration and

Nationality Act, 8 U.S.C. §§ 1101 *et seq.*, and is implemented through regulations set out

at 20 C.F.R. §§ 655.100 to 655.304 and 29 C.F.R. §§ 501.0 to 501.47.[1] The H-2A

program authorizes the admission of foreign workers to perform agricultural labor or

services of a seasonal or temporary nature.

15.     An employer in the United States may hire foreign workers to perform

agricultural labor or services of a temporary nature if the U.S. Department of Labor

("USDOL") certifies that (1) there are insufficient available workers within the United

States to perform the job, and (2) the employment of foreign workers will not adversely

affect the wages and working conditions of similarly situated U.S. workers. 8 U.S.C.

§§ 1101(a)(15)(H)(ii)(a) and 1188(a)(1); 20 C.F.R. § 655.100. Foreign workers admitted

in this fashion are commonly referred to as "H-2A workers."

16.     Federal regulations establish the minimum benefits, wages, and working

conditions that must be offered to H-2A workers by the petitioning employer to avoid

adversely affecting similarly situated U.S. workers. 20 C.F.R. §§ 655.120, -.122, -.135.

Among these terms is a requirement that, for every hour or portion thereof worked during

a pay period, the employer will pay the workers the highest of the adverse effect wage

rate ("AEWR"), the applicable prevailing wage for the occupation in the geographic area

---

[1] All citations to regulations governing the H-2A program are to the regulations as they
existed prior to June 28, 2024.

where the work is to be performed, an agreed-upon collective bargaining wage, the federal minimum wage, or the state minimum wage. 20 C.F.R. § 655.120.

17.     In 2023 and 2024, the AEWR for the "vast majority" of agricultural workers was based on the average hourly wage rate for "field and livestock worker[s]" for a state or region as reported by the Farm Labor Survey conducted by the U.S. Department of Agriculture. *See* Final Rule, *Adverse Effect Wage Rate Methodology for the Temporary Employment of H-2A Nonimmigrants in Non-Range Occupations in the United States*, 88 Fed. Reg. 12,760, 12,760, 12,766–70 (Feb. 28, 2023); *accord* 20 C.F.R. § 655.120(b)(1)(i)(A) (codifying this principle) (vacated Aug. 25, 2025).

18.     For 2023, the AEWR for H-2A field and livestock workers employed in Texas, including most harvesters and packing shed workers, was $14.87 per hour. 88 Fed. Reg. at 12,764.

19.     For 2024, the AEWR for H-2A field and livestock workers employed in Texas, including most harvesters and packing shed workers, was $15.55 per hour. 88 Fed. Reg. 86,677, 86,678 (Dec. 14, 2023).

## II.     Employer Obligations Under the H-2A Program

20.     Employers seeking the admission of H-2A workers must file an Application for Temporary Employment Certification with USDOL. 20 C.F.R. § 655.130. This application must include a job offer, commonly referred to as a "clearance order" or "job order," complying with applicable regulations. 20 C.F.R. § 655.121(a)(1). Employers must certify that the job offer describes the actual terms and conditions of the employment being offered and that it contains all material terms of the job. 20 C.F.R. § 653.501(c)(3)(viii). The clearance order must state the wage rate to be

paid, type of work, site of work, terms of employment, housing, transportation, and other job conditions that the employer agrees to provide to each worker. 20 C.F.R. §§ 655.103, -.122, -.135.

21.    H-2A workers are entitled to at least three-fourths the value of the work promised in the clearance order. 20 C.F.R. § 655.122(i). In other words, employers must offer H-2A workers employment for a total number of work hours equal to at least three-fourths of the work days of the total contract period. If the employer does not offer the worker the sufficient hours during the contract period, "the employer must pay such worker the amount the worker would have earned had the worker, in fact, worked for the guaranteed number of days."  20 C.F.R. § 655.122(i)(iv).

22.    In addition to the wage requirements set forth in 20 C.F.R. § 655.120, agricultural employers seeking to hire H-2A workers must certify that they will comply with all applicable federal and state laws.

23.    H-2A regulations prohibit employers from charging workers for recruitment costs. They further require employers to have a signed contract with any recruiter whom the employer engages, either directly or indirectly, in the international recruitment of H-2A workers, prohibiting such individuals from seeking or receiving payments or other compensation from prospective employees. 20 C.F.R. § 655.135(k).

24.    H-2A employers are required to reimburse workers who complete 50 percent of the work contract period for their reasonable costs incurred "for transportation and daily subsistence from the place from which the worker has come to work for the employer, whether in the United States or abroad, to the place of employment." 20 C.F.R. § 655.122(h)(1).

25.     H-2A employers must provide each worker with housing that meets the applicable health and safety standards, at no cost to the worker. 20 C.F.R. § 655.122(d).

26.     All employer-provided transportation must comply with the federal standards at 29 U.S.C. § 1841, 29 C.F.R. §§ 500.104 or 500.105, and 29 C.F.R. §§ 500.120 through 500.128.

27.     H-2A employers must comply with health and safety laws requiring them to provide drinking water to employees working in fields that is readily accessible and suitably cool. 20 C.F.R. § 655.135(e); 29 C.F.R. § 1928.110(c)(1).

28.     An employer must state in the clearance order whether it will provide workers with three meals a day or provide free and convenient cooking and kitchen facilities. Any charge to the workers for meals must be stated in the clearance order. 20 C.F.R. § 655.122(g). All deductions from workers' pay not required by law must be stated in the clearance order. 20 C.F.R. § 655.122(p)(1).

29.     H-2A wage requirements under 20 C.F.R. § 655.120 are not met when an employer charges unreasonable, undisclosed, or unauthorized deductions, rebates, or refunds, or otherwise requires the employee to kick back wages directly or indirectly to the employer for the employer's benefit. 20 C.F.R. § 655.122(p)(2).

30.     H-2A employers are required to keep accurate and adequate records with respect to each worker's earnings and to furnish to the worker a detailed hours and earnings statement on or before each payday. 20 C.F.R. §§ 655.122(j) and 655.122(k).

31.     Employers are required to state in the clearance order the frequency with which the worker will be paid and must pay wages when due. 20 C.F.R. § 655.122(m).

32.     H-2A employers are prohibited from intimidating, threatening, coercing, discharging, or otherwise discriminating against any person who has, among other things, participated in any investigation related to any applicable federal laws, including safety and health, employment, and labor laws, or exercised or asserted on behalf of themselves or others any right or protection afforded them by the H-2A regulations. 20 C.F.R. § 655.135(h)(1).

### III.    Defendants' Participation in the Federal H-2A Visa Program

33.     A true and correct copy of Florida Ag's 2023-2024 approved clearance order under which Plaintiffs worked is attached hereto as Exhibit A.

34.     As required by 20 C.F.R. § 653.501(c)(3)(viii), the clearance order included certifications that it described the actual terms and conditions of employment being offered and contained all material terms of the job. These certifications were signed under penalty of perjury by Jose Rodriguez, who identified himself as an owner of Florida Ag. Ex. A at 7–8.

35.     The clearance order also includes, among other things, an assurance that all working conditions complied with applicable federal and state laws. Ex. A at 4–7 (citing 20 C.F.R. § 653.501(c)(3)(iii)).

36.     USDOL reviewed Florida Ag's temporary employment certification application, including the clearance order, *see* Ex. A., that as a matter of law incorporated USDOL's regulations at 20 C.F.R. § 655 Subpart B and any obligations required under 8 U.S.C. § 1188. USDOL approved the temporary employment certification application and clearance order.

### IV.    Plaintiffs' Recruitment and Inbound Travel

37.    Defendants used recruiters including Francisco Vazquez (who is the father of Defendant Vazquez), Acosta (whose full name is believed to be Jose Luis Acosta), and entity Nava Asociados, a Mexican company, to obtain H-2A workers from Mexico, including all Plaintiffs, to fill its open employment positions. Defendants' recruiters acted as Defendants' agents in obtaining H-2A workers for the 2023-2024 season.

38.    Defendants did not execute signed contracts with their recruiters.

39.    Plaintiffs were initially recruited for employment by Acosta.

40.    Over the course of their recruitment, each Plaintiff was required to pay about $600.00 to Francisco Vazquez comprising illegal recruitment fees.

41.    Plaintiffs each spent about or over $300.00 on transportation costs, lodging, and other expenses to receive their H-2A visas and travel to Texas to work for Defendants. Nava Asociados told Plaintiffs their employer would reimburse them for their expenses once they arrived in the U.S.

42.    Each Plaintiff had to take out a loan to cover the recruitment fees and travel costs.

43.    Plaintiffs were never reimbursed for their inbound transportation and subsistence expenses or recruitment fees.

44.    After receiving their H-2A visas, Plaintiffs were transported by Florida Ag and Defendant Vazquez in vans from Monterrey, Nuevo Leon, Mexico to Hidalgo County, Texas. There were more workers than seats in the vans, requiring various workers to sit on the floors of the vans in violation of 29 C.F.R. § 500.104(1).

**V.    Plaintiffs' Employment**

45.     From approximately December 2023 to approximately May 2024, Plaintiffs were jointly employed by Defendants within the meaning of 29 U.S.C. § 203(g).

46.     Plaintiffs were employees of Defendants within the meaning of 29 U.S.C. § 203(e), 29 U.S.C. § 215(a)(3), and 20 C.F.R. § 655.103(b).

47.     Defendants were employers of Plaintiffs within the meaning of 29 U.S.C. § 203(d) and 20 C.F.R. § 655.103(b).

48.     In his role as Florida Ag's manager and supervisor of Plaintiffs, Defendant Vazquez acted directly or indirectly in the interest of an employer in relation to Plaintiffs, 29 U.S.C. § 203(d).

49.     Plaintiffs began planting, harvesting, or packing produce after arriving in Texas. They worked at various sites, including some fields and a packing facility owned by Little Bear in Hidalgo County.

50.     Florida Ag and Defendant Vazquez additionally required Plaintiff Villanueva Lopez and her female coworkers to clean Defendant Vazquez's personal residence on multiple occasions.

51.     Florida Ag and Defendant Vazquez possessed the power to hire and fire Plaintiffs and other Florida Ag workers, and in fact, hired Plaintiffs to work for Little Bear.

52.     Little Bear had the power to hire and fire Plaintiffs and other workers employed in the Little Bear packing facilities, and in fact, fired at least one of Plaintiffs' coworkers.

53.    Defendants supervised and controlled employee work schedules and conditions of employment when Plaintiffs worked in the packing facility.

54.    Plaintiffs were directly and primarily supervised by Defendant Vazquez, Florida Ag supervisor Francisco (whose full name is believed to be Francisco Santos Hernandez), Little Bear supervisors Mario (last name unknown) and Luis (last name unknown), and other Little Bear line supervisors in the packing facility.

55.    Plaintiff Vazquez Davalos was also supervised by Florida Ag supervisor "Beto" (last name unknown) while working in the fields.

56.    When working at the packing shed, Plaintiffs received their work schedules from a Little Bear chalk board posted in the packing facility, directly from Mario, or through Francisco, who received the schedule from Mario.

57.    Plaintiff Vazquez Davalos received his schedule for work in the fields from Beto.

58.    While working at the packing facility, Plaintiffs received directions on their work tasks primarily from Mario or Francisco. Plaintiffs received some instructions directly from Mario and other instructions from Francisco, who received the instructions from Mario. Plaintiffs also received instructions from the various other Little Bear line supervisors.

59.    While working in the fields, Plaintiffs received directions on their work tasks from Beto or from Defendant Vazquez.

60.    Defendants determined the method of payment for Plaintiffs.

61.    Defendants controlled the manner and means by which employees accomplished their work. Florida Ag and Defendant Vazquez assigned Plaintiffs to work

crews and transported them to their worksites. Little Bear assigned Plaintiffs their specific work tasks in the packing facility. As to their work in the packing shed, Little Bear provided Plaintiffs with training, instruction on how to complete their assignments, and all tools and equipment Plaintiffs used to complete their work.

62.     When they worked in the packing facility, Plaintiffs were working at a location owned and operated by Little Bear. Little Bear determined Plaintiffs' work schedules in the packing facility and how long they would work each shift.

63.     Florida Ag and Defendant Vazquez determined Plaintiffs' work schedules in the fields and how long they would work each shift.

64.     Plaintiffs' work harvesting and packing produce for Little Bear was integral to and a regular part of Little Bear's produce packing business.

65.     In 2023 and 2024, Little Bear was an enterprise engaged in commerce within the meaning of the FLSA, 29 U.S.C. § 203(s)(1)(A), in that it was engaged in the production of goods for interstate commerce and had employees who handled, sold, or otherwise worked on goods that moved in or were produced for interstate commerce.

66.     These goods included agricultural products processed at Little Bear's packing facilities and the equipment and tools used by Plaintiffs to process products at the Little Bear facility where they were employed.

67.     Little Bear operates its business transporting and selling its produce across at least three countries and at least four states. In addition to its own produce, Little Bear also operated its packing facility to pack agricultural products grown by other entities.

68.     Little Bear had an annual gross volume of sales made or business done of at least $500,000, exclusive of excise taxes at the retail level that are separately stated.

69.     While working in the Little Bear packing facility, Plaintiffs regularly handled goods and materials produced for interstate commerce, including agricultural products.

70.     In 2023 and 2024, Florida Ag was an enterprise engaged in commerce within the meaning of the FLSA, 29 U.S.C. § 203(s)(1)(A), in that it was engaged in the production of goods for interstate commerce and had employees who handled, sold, or otherwise worked on goods that moved in or were produced for interstate commerce.

71.     These goods included agricultural products in the fields, agricultural products processed at Little Bear's packing facilities, and the equipment and tools used by Plaintiffs to handle these agricultural products.

72.     Some of these agricultural products eventually crossed state lines.

73.     Florida Ag had an annual gross volume of sales made or business done of at least $500,000, exclusive of excise taxes at the retail level that are separately stated.

74.     Plaintiffs and the other workers were split up into different work crews. All work crews were housed and employed primarily within Hidalgo County, Texas.

75.     Plaintiffs stayed in hotels for their first couple months after arriving in Texas.

76.     Within their work crews, workers stayed in the same hotel and generally worked the same hours. However, among the work crews, workers were split between different hotels, were provided varying work hours and days off, and were assigned to differing job sites and primary job duties.

77.     Plaintiffs Reyes Lopez and Villanueva Lopez were primarily assigned to work in a Little Bear produce packing facility where they were primarily supervised by

Francisco and Mario. Defendant Vazquez also visited the packing facility to monitor Plaintiffs and their co-workers.

78.    When Plaintiff Vazquez Davalos was assigned to work in the fields harvesting produce, he was primarily supervised by Beto. Defendant Vazquez also supervised him in the fields, where he visited to monitor Plaintiff Vazquez Davalos and his coworkers. Plaintiff Vazquez Davalos was also assigned to pack produce in the packing facility where he was primarily supervised by his Little Bear line supervisor and Francisco.

79.    On Plaintiff Reyes Lopez's first day in the United States, he and his co-workers were surrounded by immigration law enforcement officials at their hotel. The officials arrived in numerous large vehicles, blocked off the entrances and exits to the hotels, and waited there until Defendant Vazquez arrived to talk to them. After speaking to Defendant Vazquez, the officials left. Plaintiff Reyes Lopez did not hear what was said between the officials and Defendant Vazquez.

80.    After their arrival in Texas, Plaintiffs quickly discovered that their employment would not be what they expected. Defendant Vazquez was aggressive and intimidating to Plaintiffs and other workers. He often yelled at them, humiliated them, and used degrading language towards them.

81.    Defendant Vazquez frequently threatened Plaintiffs and the other workers that he would take away their visas, take them back to Mexico, or call immigration on them if they did not comply with his work demands. The principal purpose of this conduct was to restrain Plaintiffs from leaving Defendants' employment and control.

82.     When Plaintiff Vazquez Davalos worked in the fields, Defendant Vazquez told him and the other workers that they were not allowed to go to the bathroom or drink water because that would take too much time away from work. He told them they were not allowed to stand up in the fields, but that instead they needed to stay bent over filling their baskets so they could pick the produce faster.

83.     Defendant Vazquez would often tell Plaintiffs Reyes Lopez and Villanueva Lopez that they were nothing in the United States and that they owed him for the opportunity to come work.

84.     Florida Ag and Defendant Vazquez did not provide Plaintiffs and other workers with suitable drinking water, at no cost to the workers, that was readily accessible while they were working in the fields nor sufficiently cool as required by the H-2A regulations and Occupational Safety and Health Standards for agricultural employers. On one occasion Plaintiff Reyes Lopez felt faint due to the heat, was not provided with cool water, and vomited when he was working in the field.

85.     Upon arriving in Texas, Florida Ag and Defendant Vazquez informed Plaintiffs that they were required to pay $120 per week for food. This charge was not previously disclosed to Plaintiffs and was not included in or authorized by the clearance order. Instead, the clearance order stated that Florida Ag would provide free and convenient cooking facilities for Plaintiffs to prepare their own meals. Ex. A at 3.

86.     The food that Plaintiffs were required to pay for was at times delivered outside of mealtimes and left out for hours before Plaintiffs were allowed a break to eat. Frequently Plaintiffs found the quantity of food provided insufficient, discovered pests in their food, or found the food had spoiled.

87.     On one occasion Plaintiff Villanueva Lopez suffered nausea and vomiting and had to leave work. Despite informing Florida Ag and Defendant Vazquez that she had become ill, Defendant Vazquez chastised her for missing work. He discussed Plaintiff Villanueva Lopez's absence from work in front of other employees during a group employee meeting, reprimanding her for missing work.

88.     Plaintiffs complained to Defendant Vazquez about the food and requested that they be allowed to purchase their own food instead of paying for the food provided. Defendant Vazquez told Plaintiffs that they could purchase their own food if they wanted to, but either way, he would continue deducting $120 per week from their wages.

89.     Defendants did not provide Plaintiffs with compliant housing under the H-2A regulations for at least their first couple months in the United States. While Plaintiffs were staying at hotels, Defendants were often past due on their payments to the hotels. As a result, the hotels would lock Plaintiffs and the other workers out of their rooms. When Plaintiffs returned to the hotels after work, they were unable to get into their rooms to rest or retrieve their belongings. They often had to wait outside into the middle of the night, crowd into other workers' rooms to sleep on the floors or double up in the beds, or try to convince the hotel staff to unlock their rooms. Defendant Vazquez would not always respond to the workers or show up to the hotels to ensure that Plaintiffs could access their rooms or pay his bill.

90.     Plaintiff Villanueva Lopez's crew was required to sleep two workers per bed every night while they were living in the hotels.

91.     On multiple occasions Defendant Vazquez took deductions out of Plaintiffs Reyes Lopez's and Villanueva Lopez's pay, stating that he needed the money for hotel and other housing costs.

92.     After Plaintiffs had endured the uncertainty of whether they would have a bed to sleep in after work for a couple months, Defendant Vazquez moved Plaintiffs and the other workers out of the hotels and into houses in Edinburg, Texas.

93.     Defendant Vazquez moved Plaintiffs and the other workers out of the hotels in the middle of the night. He went to the hotels in the middle of the night and told the workers to get their things together quickly and quietly and to leave their rooms without making any noise. He told them to carry their bags and not roll or drag them to avoid making noise.

94.     Plaintiffs Reyes Lopez and Villanueva Lopez were not always offered the 40 hours per week listed in the clearance order. Ex. A at 1. Plaintiff Villanueva Lopez was not offered the requisite three-fourths hours of the contract period.

95.     Defendants failed to maintain accurate and adequate records with respect to what type of work Plaintiffs did each day, when they worked, the number of hours they worked, the number of hours of work offered each day, and their earnings.

96.     Defendants failed to provide the requisite hours and earnings statements to Plaintiffs on or before each payday as required by the H-2A regulations and the FLSA.

97.     Plaintiffs were not paid the FLSA minimum wage during some workweeks, including multiple weeks of work for which they were not paid any wages at all.

98. In some workweeks, illegal deductions for food and housing drove Plaintiffs' wages below the federal minimum wage for the workweek.

99. Defendants failed to pay Plaintiffs overtime compensation as required by the FLSA, 29 U.S.C. § 207(a)(1), in weeks where they completed non-agricultural work within the meaning of 29 U.S.C. §§ 203(f) and 213(b)(12).

100. Defendant Vazquez, or supervisors Francisco or Beto, generally provided Plaintiffs with their pay. However, Plaintiffs Reyes Lopez and Vazquez Davalos were regularly paid late.

101. For the first couple months of work Plaintiffs were paid in cash. They were paid well below the AEWR for their hours worked.

102. On a few occasions workers, including Plaintiffs Reyes Lopez and Vazquez Davalos, told Defendant Vazquez and their other Florida Ag supervisors that they were not going to work until they got paid. On one occasion this resulted in the workers being paid, but other times Francisco merely promised the workers they would be paid if they went to work. On other occasions Defendant Vazquez screamed at the workers and physically grabbed and pushed them until they got on the bus to go to work.

103. Plaintiff Villanueva Lopez raised complaints with Francisco and Defendant Vazquez about not being paid for all hours worked. Defendant Vazquez responded that he would pay her in the future.

104. Plaintiff Reyes Lopez raised his concerns about the lack of pay to Little Bear. He informed his Little Bear supervisors, including Mario and Luis, that they were not receiving their pay from Florida Ag and Defendant Vazquez. The Little Bear supervisors responded that Defendant Vazquez should pay them.

105.    Plaintiffs Reyes Lopez and Villanueva Lopez raised complaints to their Little Bear supervisors about Defendant Vazquez's aggressive, intimidating, and controlling behavior towards them. Some of the Little Bear supervisors told Plaintiffs Reyes Lopez and Villanueva Lopez that the way Defendant Vazquez treated them was not right.

106.    Defendant Vazquez requested that Plaintiff Villanueva Lopez work additional days in his house to care for his children. She told Defendant Vazquez that that was not the work she was hired to do, and he became upset. Defendant Vazquez treated Plaintiff Villanueva Lopez even more harshly after that.

107.    Defendant Vazquez did not pay Plaintiff Villanueva Lopez for all her hours worked despite paying other workers in her crew for their hours worked. He reprimanded her more often and more aggressively, and he assigned her more difficult work. For example, in the packing shed she was shifted from standing and tagging produce to the more tiring job of moving heavy products from one place to another. Defendant Vazquez told Plaintiff Villanueva Lopez that it was her obligation to work and obey him since he brought her to the United States.

108.    At the beginning of the season Plaintiff Villanueva Lopez and her work crew were not provided with many hours. On some days after their few work hours or on days when they were provided no hours, Plaintiff Villanueva Lopez and her coworkers went to a nearby gym.

109.    After discovering Plaintiff Villanueva Lopez and her coworkers were going to the gym, Defendant Vazquez entered Little Bear's packing facility and screamed at other workers to clear out the meeting room. He made Plaintiff Villanueva Lopez and

her coworkers go to the meeting room, and he yelled at them for going to the gym. Defendant Vazquez told Plaintiff Villanueva Lopez that she did not have permission to go to the gym, saying he brought her here to work and that that was all she had permission to do. He told her to remember she was nobody in the United States. Defendant Vazquez humiliated Plaintiff Villanueva Lopez and her coworkers, yelling at them loudly enough for other workers in the packing facility to overhear. Defendant Vaquez's principal purpose in yelling at the workers for going to the gym was to restrain their movement to his employment and control.

110.    About a couple months after Plaintiffs began working for Defendants the USDOL Wage and Hour Division ("WHD") initiated an investigation into the employment practices of Florida Ag.

111.    After the initiation of the WHD investigation and the occasional presence of WHD investigators at Defendants' worksites, Florida Ag began paying Plaintiffs and the other workers with checks. Florda Ag also began providing workers with paystubs.

112.    Once paid by check, Plaintiffs nominally received the AEWR for their work, but Defendants continued to make illegal deductions and charges from Plaintiffs' wages. Defendants also failed to pay Plaintiffs for all the hours they worked.

113.    The paystubs provided to Plaintiffs with their checks continued to be noncompliant with the recordkeeping requirements of the H-2A regulations and the FLSA.

114.    Plaintiffs Reyes Lopez and Vazquez Davalos, despite receiving paychecks, were often unable to cash those checks and receive the pay they were owed for hours worked. Plaintiffs Reyes Lopez and Vazquez Davalos were transported by

Florida Ag with their work crews to the bank to cash their checks. However, frequently only the workers at the front of the line were able to cash their checks. The bank attendants would inform the remaining workers that there was no more money in the account and that they would not be able to cash the remaining checks.

115.    On some occasions Defendant Vazquez would provide a small amount of cash, generally not exceeding half the amount on their paycheck, to the workers who were unable to cash their checks. He would tell them he would get them the rest of their pay later. However, they often went days with no cash and no pay at all.

116.    Early in the season, within the first few weeks of Plaintiffs' arrival in the United States, one worker complained to Defendant Vazquez about not being paid properly. Plaintiffs Reyes Lopez and Vazquez Davalos were at the hotel when Defendant Vazquez arrived to pay the workers. When their coworker complained to Defendant Vazquez about the pay, Defendant Vazquez became very aggressive, screaming at the worker. He told the worker to get his things together and to get in Defendant Vazquez's truck. He said he was taking the worker back to Mexico. Defendant Vazquez then drove the worker away. A few hours later Defendant Vazquez brought the worker back to the hotel, and the worker was crying. The next morning that worker was gone.

117.    Plaintiffs and the other workers experienced and witnessed similar acts of aggression by Defendant Vazquez throughout their employment.

118.    Because of the issues Plaintiffs and the other workers had with the food provided, they often wanted to obtain their own food. Plaintiffs met an individual who offered them a taxi service to go buy food, run errands, or take care of other necessities when Florida Ag and Defendant Vazquez did not provide them with transportation.

119.    When Defendant Vazquez found out about Plaintiffs' and other workers' arrangements with the taxi service, he became angry and said it was forbidden. He told Plaintiffs and other workers that if they continued to use the taxi service, he would call immigration officials or take the workers back to Mexico. Sometimes Defendant Vazquez showed up at the hotel or housing units when the individual providing the taxi service was there. Whenever he saw the taxi driver, Defendant Vazquez screamed at him. On one occasion Defendant Vazquez hit the man in front of Plaintiff Reyes Lopez and other workers and got into a physical fight with him. One purpose of forbidding Plaintiffs to travel with the taxi driver was to restrain Plaintiffs to their housing.

120.    Defendant Vazquez caused Plaintiffs and the other workers to fear him by using aggression and intimidation to isolate and control the workers.

121.    Defendant Vazquez often entered Plaintiffs' housing units without knocking or waiting to be let in. Sometimes he would bang on the door aggressively, but sometimes he would just enter. He also entered the housing yelling at the workers. Sometimes he would enter and physically grab the workers and their things and push them out the door, yelling at them to get to work or get out of the room or house.

122.    One time Defendant Vazquez entered Plaintiff Villanueva Lopez's housing in the middle of the night. This was during the time that Plaintiff Villanueva Lopez lived in a house with the other female workers. Defendant Vazquez screamed at the women and made them get up and go outside of the house while he searched it. When Defendant Vazquez allowed the women to go back inside after he was done searching their house, Plaintiff Villanueva Lopez and the other women saw that Defendant Vazquez

and his wife had not left but instead stayed standing outside the female workers' house monitoring them.

123.    Plaintiff Villanueva Lopez and the other women tried to block the doors of their housing and their rooms because they were scared of Defendant Vazquez, who would enter their housing at any time without knocking or waiting for them to open the door for him. Plaintiff Villanueva Lopez was often unable to sleep soundly due to her fear of Defendant Vazquez.

124.    Defendant Vazquez often berated Plaintiff Villanueva Lopez, including for missing work due to injury and illness.

125.    On one occasion Plaintiff Villanueva Lopez slipped and fell in her housing because of a water leak. She advised Defendant Vazquez of what happened and that she had to miss work to go to the hospital because she felt unwell and believed she had been injured in the fall.

126.    While she was in the hospital, Plaintiff Villanueva Lopez learned she was pregnant. Later she was feeling unwell with pregnancy-related symptoms, so she missed a few days of work. Defendant Vazquez was furious that Plaintiff Villanueva Lopez was missing work, so she provided his secretary with a receipt from her subsequent visit to a medical clinic to show she had been sick.

127.    Defendant Vazquez's secretary called the medical clinic and obtained Plaintiff Villanueva Lopez's medical file without her consent. Defendant Vazquez's secretary informed Plaintiff Villanueva Lopez and Defendant Vazquez that she knew Plaintiff Villanueva Lopez was pregnant, how far along she was, and the sex of her baby.

128.    Plaintiff Villanueva Lopez complained to Defendant Vazquez and his secretary that she had not given them consent to obtain her medical information. Defendant Vazquez screamed at Plaintiff Villanueva Lopez, telling her that she was not allowed to be pregnant and that he was going to send her back to Mexico.  He told her she had to sign a release stating that she could not sue him if her baby was born with defects because she had been working in the packing facility with high quantities of bleach.

129.    After this conversation, Plaintiff Villanueva Lopez decided she had to escape her employment and Defendant Vasquez's abuse. She was able to find a way to leave that day before Defendant Vazquez returned.

130.    Around the time of Plaintiff Villanueva Lopez's escape, the WHD investigators were continuing to visit Defendants' worksites and housing sites to try to interview employees.

131.    Defendant Vazquez and other Florida Ag supervisors picked which workers would be allowed to talk to the WHD investigators and told them what information they should provide. They forbade other workers from speaking to the investigators.

132.    Supervisor Francisco sent a text to Plaintiff Villanueva Lopez and her work crew, before she had escaped, telling them to inform the investigators that they were only working in the packing facility even though Defendant Vazquez had also sent them to work in the fields, to clean his personal residence, and to care for his children.

133.    As multiple workers were escaping and WHD investigators were inspecting Defendants' employment practices, Defendant Vazquez and the Florida Ag recruiters escalated their threats against the workers.

134.    Recruiter Acosta told Plaintiff Vazquez Davalos and other workers that if they left their employment there would be serious consequences for them when they returned to Mexico. Acosta said that he would not be paid for referring workers to Defendants if those workers left. He said if they wanted to leave safely, they would have to pay him the money he would make from Defendants for the referral. He told the workers that he had connections with the cartel in their hometowns. Plaintiff Vazquez Davalos and some of the other workers are from the same hometown as Acosta, and some had heard about his connections with the cartel.

135.    Plaintiff Reyes Lopez also heard about Acosta's threats and connection to the cartel from his coworkers.

136.     Defendant Vazquez gathered workers at this time and told them they would see what would happen to them when they got back to Mexico if they stopped working or spoke to the WHD investigators.

137.    Plaintiffs Reyes Lopez and Vazquez Davalos took these threats seriously and were very worried that Defendant Vazquez would follow through on these threats if they did not continue laboring for him. They also believed that if Defendant Vazquez told Acosta to use his connections to cause them physical and life-threatening harm, he would do so.

138.    One day around May 2024 Plaintiffs Reyes Lopez and Vazquez Davalos were at the housing site when WHD investigators arrived. The investigators talked to

Plaintiff Vazquez Davalos and his coworker. Plaintiff Vazquez Davalos was nervous to speak to them but wanted to see if they could help him escape this terrible situation. Inside his housing Plaintiff Vazquez Davalos answered the investigators' questions and told them what he had been experiencing.

139.     Plaintiff Reyes Lopez arrived at Plaintiff Vazquez Davalos' housing while the investigators were inside conducting the interview. Plaintiff Reyes Lopez was also nervous about speaking to them but decided to report what had been happening and answer their questions, hoping he and his coworkers would get help.

140.     The next day, Defendant Vazquez aggressively entered Plaintiff Vazquez Davalos' housing. Plaintiff Vazquez Davalos did not know Defendant Vazquez was coming, and Defendant Vazquez did not knock or wait before entering. He just entered the house and started yelling. Plaintiff Vazquez Davalos was frightened by how angry and aggressive Defendant Vazquez was. Defendant Vazquez said he knew Plaintiff Vazquez Davalos and his coworkers had talked to the investigators. Defendant Vazquez said he had contacts with the USDOL and the next day he was going to find out what Plaintiffs Vazquez Davalos and Reyes Lopez said to them. Defendant Vazquez screamed at Plaintiff Vazquez Davalos and his coworker, saying they would pay for whatever they had said to the investigators.

141.     That day Plaintiff Reyes Lopez received a text from supervisor Francisco telling him that Defendant Vazquez wanted to speak to him. Plaintiff Reyes Lopez was frightened by that because his coworkers had told him about how aggressive and angry Defendant Vazquez had been when he entered Plaintiff Vazquez Davalos' housing.

142.    Plaintiffs Reyes Lopez and Vazquez Davalos were scared of what Defendant Vazquez might do to them. They thought he might do something to physically harm them or might tell Acosta to get the cartel involved. They thought their lives were at risk.

143.    Plaintiffs Reyes Lopez and Vazquez Davalos made a plan to escape that night. They called the person who offered them the taxi services and asked him to pick them up in the middle of the night, hoping Defendant Vazquez would not find out.

144.    However, as Plaintiffs Reyes Lopez and Vazquez Davalos were leaving their housing to get in the car, they saw Defendant Vazquez's truck at the housing site. Defendant Vazquez followed behind them as the taxi driver pulled away from the housing. Plaintiffs Reyes Lopez and Vazquez Davalos were scared so they asked the taxi driver to try to get away from Defendant Vazquez. Defendant Vazquez was still behind them until the taxi driver took a few turns and sped up. Finally, Plaintiffs Reyes Lopez and Vazquez Davalos were able to escape.

145.    As a result of Florida Ag's and Defendant Vazquez's frequent threats and abusive tactics, Plaintiffs continued suffering from fear and anxiety even after they had escaped.

**FIRST CAUSE OF ACTION: FLSA MINIMUM WAGE VIOLATIONS**
*Against All Defendants*

146.    This count sets forth a claim for damages and declaratory relief by all Plaintiffs for Defendants' failure to pay minimum wages in multiple workweeks in which Plaintiffs received less than $7.25 per hour for hours worked as required by the FLSA, 29 U.S.C. § 206(a).

147.    For these violations, as set forth above, Plaintiffs have suffered damages and are entitled to their unpaid minimum wages and an equal amount in liquidated damages, costs of court, and attorney's fees pursuant to 29 U.S.C. § 216(b).

### SECOND CAUSE OF ACTION: FLSA OVERTIME VIOLATIONS
*Against All Defendants*

148.    This count sets forth a claim for damages and declaratory relief by Plaintiffs for Defendants' failure to pay one and one-half times the regular rate of pay for each hour of work in excess of 40 hours that Plaintiffs worked during each week in which they performed non-agricultural labor, as required by the FLSA, 29 U.S.C. § 207(a).

149.    For these violations, as set forth above, Plaintiffs have suffered damages and are entitled to their unpaid overtime wages and an equal amount in liquidated damages, costs of court, and attorney's fees pursuant to 29 U.S.C. § 216(b).

### THIRD CAUSE OF ACTION: FLSA RETALIATION
*Against Florida Ag and Defendant Vazquez*

150.    This count sets forth a claim for damages and declaratory relief by Plaintiffs for retaliation arising out of Florida Ag's and Defendant Vazquez's discrimination against them with respect to their compensation, terms, conditions, and other privileges of employment because they provided information relating to violations of the FLSA to Defendants and to USDOL, and because they objected to and refused to participate in assigned tasks that violated the FLSA.

151.    For these violations, as set forth above, Plaintiffs have suffered damages and are entitled to compensatory and punitive damages, lost wages for Plaintiff Villanueva Lopez, costs of court, and attorney's fees pursuant to 29 U.S.C. § 216(b).

### FOURTH CAUSE OF ACTION: TVPRA FORCED LABOR VIOLATIONS
*Against Florida Ag and Defendant Vazquez*

152.    This count sets forth a claim for damages and declaratory relief by Plaintiffs for Florida Ag's and Defendant Vazquez's violations of the forced labor provision of the TVPRA, 18 U.S.C. § 1589.

153.    18 U.S.C. § 1589 states that it is unlawful to "knowingly provide[] or obtain[] the labor or services of a person by any one of, or by any combination of, the following means—(1) by means of force, threats of force, physical restraint, or threats of physical restraint to that person or another person; (2) by means of serious harm or threats of serious harm to that person or another person; (3) by means of the abuse or threatened abuse of law or legal process; or (4) by means of any scheme, plan, or pattern intended to cause the person to believe that, if that person did not perform such labor or services, that person or another person would suffer serious harm or physical restraint."

154.    Florida Ag and Defendant Vazquez, directly and through the acts of their agents as set forth above, knowingly provided and obtained the labor or services of Plaintiffs Reyes Lopez and Vazquez Davalos through threats of serious harm to them and others, including threats of physical and life-threatening harm by means of cartel violence, in violation of 18 U.S.C. § 1589(a)(2).

155.    Florida Ag and Defendant Vazquez, directly and through the acts of their agents as set forth above, knowingly provided and obtained the labor or services of Plaintiffs through the threatened abuse of law or legal process, including threats to take away their visas, take them to Mexico, and report them to immigration officials for deportation, in violation of 18 U.S.C. § 1589(a)(3).

156.    Florida Ag and Defendant Vazquez, directly and through the acts of their agents as set forth above, knowingly provided and obtained the labor or services of

Plaintiffs through a scheme, plan, and pattern intended to cause them to believe that if they did not perform such labor or services, that they would suffer serious harm or physical restraint, including arrest, physical, legal, reputational, and financial harm, in violation of 18 U.S.C. § 1589(a)(4).

157.    For these violations, Plaintiffs have suffered injury and are entitled to recover damages, including compensatory damages, punitive damages, and attorney's fees and costs pursuant to 18 U.S.C. § 1595(a).

### FIFTH CAUSE OF ACTION: TVPRA TRAFFICKING VIOLATIONS
#### *Against Florida Ag and Defendant Vazquez*

158.    This count sets forth a claim for damages and declaratory relief by Plaintiffs for Florida Ag's and Defendant Vazquez's violations of the trafficking provision of the TVPRA, 18 U.S.C. § 1590.

159.    18 U.S.C. § 1590 provides that "[w]hoever knowingly recruits, harbors, transports, provides, or obtains by any means, any person for labor or services in violation of this chapter," including the laws prohibiting forced labor, has engaged in unlawful behavior under the TVPRA.

160.    Florida Ag and Defendant Vazquez knowingly recruited, harbored, transported, provided, and obtained Plaintiffs for their labor and services in violation of the laws prohibiting forced labor.

161.    For these violations, as set forth above, Plaintiffs have suffered injury and are entitled to recover damages, including compensatory damages, punitive damages, and attorney's fees and costs pursuant to 18 U.S.C. § 1595(a).

### SIXTH CAUSE OF ACTION: BREACH OF CONTRACT
#### *Against All Defendants*

162.    This count sets forth a claim for damages by Plaintiffs for Defendants' breaches of contract.

163.    Defendants employed Plaintiffs from approximately December 2023 to approximately May 2024 through the H-2A program.

164.    The terms as set out in the regulations implementing the H-2A program, the temporary employment certification application, and the clearance order attached as Ex. A hereto constituted an employment contract between Defendants and Plaintiffs.

165.    Plaintiffs performed all material contractual obligations of employment that they were called upon to perform under their employment contracts with Defendants.

166.    Defendants failed to perform their obligations under their employment contracts with each Plaintiff and materially breached their contractual obligations owed to each Plaintiff from approximately December 2023 to May 2024 by failing to:

    a.  prohibit all recruiters from seeking or receiving payment or other compensation from prospective employees as required by 20 C.F.R. § 655.135(k);

    b.  provide Plaintiffs with transportation compliant with federal standards at 29 U.S.C. § 1841, 29 C.F.R. §§ 500.104 or 500.105, and 29 C.F.R. §§ 500.120 through 500.128;

    c.  provide housing that met the applicable health and safety standards to all Plaintiffs, at no cost to them, as required by 20 C.F.R. §§ 655.122(d) and 655.122(p)(2);

    d.  adhere to the clearance order's provision on employer-provided meals as required by 20 C.F.R. §§ 655.122(g) and 655.122(p)(1).

e.  pay Plaintiffs at least the AEWR for each hour worked, as required by 20 C.F.R. §§ 655.120(a) and 655.122(l);

f.  provide Plaintiffs with drinking water that was readily accessible and suitably cool, as required by 20 C.F.R. § 655.135(e) and 29 C.F.R. § 1928.110(c)(1).

g.  pay Plaintiffs at least the minimum wage for each workweek as required by 20 C.F.R. § 655.135(e);

h.  pay Plaintiffs overtime compensation, as required by 20 C.F.R. § 655.135(e), of at least one and one-half times the regular rate of pay for all hours worked over 40 in workweeks in which some of the work they performed was not "agricultural" within the meaning of 29 U.S.C. §§ 203(f) and 213(b)(12);

i.  assign Plaintiffs solely to perform work disclosed in the clearance order;

j.  offer Plaintiff Villanueva Lopez employment for a total number of work hours equal to at least three-fourths of the workdays of the total contract period under 20 C.F.R. § 655.122(i);

k.  pay Plaintiffs wages when due pursuant to 20 C.F.R. § 655.122(m) and the Texas Payday Act, Tex. Lab. Code §§ 61.011 and .014.

l.  make, keep, and maintain complete and accurate payroll records as described by 20 C.F.R. §§ 655.122(j) and 655.122(k);

m.  provide Plaintiffs with complete hours and earnings records as required by 20 C.F.R. § 655.122(k);

n.  reimburse all Plaintiffs for their inbound travel and subsistence costs pursuant to 20 C.F.R. § 655.122(h)(1);

o.  refrain from taking deductions from Plaintiffs' pay that were not disclosed in the H-2A contract or required by law, pursuant to 20 C.F.R. § 655.122(p);

p.  refrain from retaliation against Plaintiffs under 20 C.F.R. § 655.135(h)(1); and

q.  refrain from subjecting Plaintiffs to forced labor in violation of the TVPRA, as required by 20 C.F.R. § 655.135(e).

167.    Defendants' breaches of Plaintiffs' employment contracts caused Plaintiffs substantial injuries, including lost wages and payment of expenses and charges prohibited by their contracts.

168.    Defendants are liable to Plaintiffs for all actual, incidental, reliance, expectation, consequential, and compensatory damages incurred as a result of their breaches of contract, as well as Plaintiffs' reasonable attorney's fees and costs, pursuant to Texas Civil Practice and Remedies Code § 38.001(b).

### SEVENTH CAUSE OF ACTION: FALSE IMPRISONMENT
*Against Florida Ag and Defendant Vazquez*

169.    This count sets forth a claim for damages by Plaintiffs arising out of Florida Ag's and Defendant Vazquez's false imprisonment of Plaintiffs.

170.    Florida Ag and Defendant Vazquez willfully detained Plaintiffs without their consent and without authority of law through threats of serious harm to Plaintiffs' persons and reputations in order to restrain them from moving to a place outside Florida Ag's and Defendant Vazquez's control.

171.    Florida Ag's and Defendant Vazquez's false imprisonment of Plaintiffs caused Plaintiffs substantial injuries, including fright, humiliation, mental anguish, and emotional distress.

172.    Florida Ag and Defendant Vazquez are liable to Plaintiffs for all actual damages, exemplary damages, interest, and court costs.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray that this Court:

a.    declare that Defendants, by the acts and omissions described above, violated Plaintiffs' rights under the minimum wage provisions of the FLSA at 29 U.S.C. § 206(a) as set forth in Plaintiffs' First Cause of Action;

b.    grant judgment in favor of Plaintiffs on their claims under the minimum wage provisions of the FLSA, as set forth in their First Cause of Action, in the amount of the unpaid minimum wages as well as an equal amount as liquidated damages, costs of court, and attorney's fees;

c.    declare that Defendants, by the acts and omissions described above, violated Plaintiffs' rights under the overtime provisions of the FLSA at 29 U.S.C. § 207(a) as set forth in Plaintiffs' Second Cause of Action;

d.    grant judgment in favor of Plaintiffs on their claims under the overtime provisions of the FLSA, as set forth in their Second Cause of Action, in the amount of the unpaid overtime wages as

well as an equal amount as liquidated damages, costs of court, and
attorney's fees;

e.    declare that Florida Ag and Defendant Vazquez, by the acts and
omissions described above, violated Plaintiffs' rights under the
anti-retaliation provisions of the FLSA at 29 U.S.C. § 215(a)(3) as
set forth in Plaintiffs' Third Cause of Action;

f.    grant judgment in favor of Plaintiffs on their claims under the anti-
retaliation provisions of the FLSA, as set forth in their Third Cause
of Action, and award them compensatory and punitive damages,
including lost wages for Plaintiff Villanueva Lopez, as well as
costs of court and attorney's fees;

g.    declare that Florida Ag and Defendant Vazquez, by the acts and
omissions described above, violated Plaintiffs' rights under the
forced labor provisions of the TVPRA at 18 U.S.C. § 1589 as set
forth in Plaintiffs' Fourth Cause of Action;

h.    grant judgment in favor of Plaintiffs on their TVPRA forced labor
claims, as set forth in their Fourth Cause of Action, and award
them damages, including punitive damages, and attorney's fees
and costs;

i.    declare that Florida Ag and Defendant Vazquez, by the acts and
omissions described above, violated Plaintiffs' rights under the
trafficking provisions of the TVPRA at 18 U.S.C. § 1590 as set
forth in Plaintiffs' Fifth Cause of Action;

j.      grant judgment in favor of Plaintiffs on their TVPRA trafficking

claims, as set forth in their Fifth Cause of Action, and award them

damages, including punitive damages, and attorney's fees and

costs;

k.      grant judgment in favor of Plaintiffs on their breach of contract

claims as set forth in their Sixth Cause of Action and award them

compensatory damages and attorney's fees;

l.      grant judgment in favor of Plaintiffs on their false imprisonment

claims as set forth in their Seventh Cause of Action and award

them damages, including compensatory damages, exemplary

damages, interest, and costs;

m.      award Plaintiffs pre- and post-judgment interest, as allowed by law;

n.      award Plaintiffs the costs of this action; and

o.      grant such other and further relief as this Court deems just and

appropriate.

Respectfully submitted,

TEXAS RIOGRANDE LEGAL AID, INC.

By: */s/ Deborah Osborn*
Deborah Osborn
Attorney-in-Charge
1331 Texas Ave
El Paso, TX 79901
(915) 585-5144
Fax: (956) 591-8752
Texas Bar No. 24131559
S.D. Tex. No. 3941294
dosborn@trla.org

*/s/ Sidonia Mitchell*
E. Sidonia Mitchell
1331 Texas Ave
El Paso, TX 79901
(956) 825-3158
Fax: (956) 591-8752
Texas Bar No. 24125331
S.D. Tex. No. 3726995
smitchell@trla.org

*/s/ Douglas L. Stevick*
Douglas L. Stevick
300 S. Texas Blvd.
Weslaco, TX 78596
(956) 982-5557
Fax: (956) 591-8752
Texas Bar No. 00797498
S.D. Tex. No. 21358
dstevick@trla.org

ATTORNEYS FOR PLAINTIFFS